# West Chicago Street Railroad Company v. Gertrude M. Brown.

## Gen. No. 10,989.

1. VERDICT—*test of when verdict should be set aside.* The question,
of course, is not what the court would have found upon the same state
of proof, but whether the verdict is so clearly against the evidence as
the result of passion, prejudice or other improper influence upon the
jury as to require the granting of a new trial.

2. RULE—*when, incompetent.* A rule of a street car company providing where its street cars will stop to receive or discharge passengers, is not competent in its own behalf in a suit brought against it by a passenger for personal injuries.

3. ORDINANCE—*when, incompetent.* An ordinance providing where cars shall stop at street intersections, is not competent for the purpose of showing where a street car should stop at a point where the cars merely turn a street corner.

FREEMAN, P. J., dissenting.

Action on the case for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1902. Affirmed. Opinion filed March 1, 1904.

**Statement by the Court.** In a suit brought by appellee against appellant to recover damages for personal injuries sustained by her while attempting to board one of its cars, she recovered judgment for $3,500, from which this appeal is taken.

The declaration charges that appellant stopped one of its cable trains in Madison street at its intersection with State street in Chicago, and that while appellee was in the act of boarding said train, appellant's servants negligently caused it to be suddenly and violently started, whereby appellee was thrown from the train to the pavement and received the injuries sued for. The plea was the general issue.

The case has been tried four times. At the first, the jury disagreed; at the second, the jury were, during the trial, discharged on motion of appellee; at the third, she was awarded a verdict for $3,250, which was set aside by the court; and at the fourth she recovered the present judgment.

JOHN A. ROSE and LOUIS BOISOT, for appellant; W. W. GURLEY, of counsel.

R. J. FINN and WILLIAM PRENTISS, for appellee.

MR. JUSTICE STEIN delivered the opinion of the court.

The plaintiff was the only witness in her own behalf testifying to the accident. Her account of it is as follows:

"I was coming up Madison street, and I saw a Rockwell street car, and, as I crossed the street, that went around

the curve and I suppose went on. I then went on in front of Buck & Rayner's and Streeter's. I then saw a West Fortieth street car coming up Madison street. That was the car I wanted to take, and as it neared me I raised my hand and motioned the gripman, and he acknowledged it by bowing his head. I then stepped down in the street and he brought the car to a standstill, and I walked west towards the car to get on. I placed my right foot on the first step of the first trailer and took hold with my left hand, when the car suddenly started and threw my foot off the step. I then clung on with my left hand, and of course, the car going around the curve, threw me out in this position (illustrating), and back against the car. When I came back the third time I caught on with my right hand and I held in that position until the car nearly reached a standstill on State street, near the Boston Store, when the conductor from the grip came and assisted me on the platform. I did not see any conductor on the car I took hold of until after I was injured. I saw the conductor on the car on which I was injured about ten minutes afterwards. He came from the rear of the car. The man who assisted me on the car came from the grip; I saw him come. That was the first one I saw. I helped myself a little. He took hold of my arm and helped me up on the platform. I then stepped in the door, it was a closed car, and sat down. I had a small package in my right hand. When I took hold with my right hand and swung out that way, the bundle flew out of my hand and struck the gate. I first took hold with my left hand and then finally caught hold with my right. I sat down in the car. After I had sat there about ten minutes I saw the conductor coming from the rear of the car. He went through and talked to the conductor on the grip; then he came back and spoke to me."

The train consisted of three cars, the grip-car, a Madison street trailer and an Ogden avenue trailer. Each car had a conductor. The gripman and the three conductors were called as witnesses by appellant. J. C. Stead, the gripman, testified in part as follows:

"As I was approaching State street going east on Madison street, I noticed this lady coming running to the car. She was on the corner of State and Madison. I was going around the curve and seen the lady come running. She run and stepped right into the car while the car was in motion. She stumbled a little, and I paid no more attention to her after that. I kept right on going. She got on the front end of the Madison street trailer. At that time the grip-car was just beyond the cross-walk. That would bring the trailer right even with the cross-walk. The curve commences a little east of the cross-walk. The car was moving on that curve when she attempted to get on. The car was going around there about three or four miles an hour at that time. James Perrin, the conductor of the grip-car, was on the front end of the first trailer behind the grip, taking off the gate. I noticed the girl stumbled, and the conductor steadied her, so, by that, he must have had the gate off. Of course, I turned around to the front end of the car after that; paid no attention to her, as she did not fall off nor fall in any way. I could not say how he steadied the young woman, because I paid attention to the front end of the car after that. I did not stop west of the cross-walk on Madison street that morning. I noticed this young lady by her action coming toward the train. I did not nod my head that I remember of. I made a report of this matter. The lady moved naturally, kind of quick, and drew my attention that she was after the Madison street car. The lady had a package at the time. I could not say how large the parcel was. When I seen the lady get on the car she kind of stumbled and the conductor steadied her. Of course, I did not pay any more attention to that. Of course, I seen that she did not fall off the car, but she kind of stumbled forward on it, and as I had to watch the front end I paid no more attention to it, and went right along around the curve."

James Perrin was the conductor of the grip-car and not in appellant's employ at the time of the trial. He described the accident as follows:

"As my car came from the west on Madison street that morning it stopped on Dearborn street and did not stop after it left Dearborn until it got to State street. I was on the front platform of that first trailer after we left Dearborn street. I got on the front platform to take off the front gate in order that passengers could get on after we came to a stop on State street. After I took off the gate and the train passed north on State street people would get on on the west side. There were no tracks where they got on. On the east side there were tracks of the Chicago City Railway Company. I know where the cross-walk is from the Champlain building to Buck & Rayner's. I had the gate off, when we reached that place. I noticed this young woman, Miss Brown, before she left the sidewalk. I noticed she was hurrying for the car. When I first saw her she had just about stepped off the sidewalk, about the middle of the sidewalk, I mean the sidewalk of State and Madison. She may have been right on the cross-walk. She was not more than a foot west of the cross-walk. She was walking for the trailer. I did not see her lift up her hand. I did not see the gripman Stead as he was going around the corner nod his head to her. I did not see anything of that kind. She came on a fast walk. When she got up to the car she jumped to get on. She went to step on, stepped on the car, the first step, taking hold of the handle at the front end of the car. She made a misstep or slip, or something, and as she did I catched her by the elbow and steadied her. I asked her if she was hurt and she made a retort which I could not understand, and she went in the car. That is all I had to do with it. The car was in motion when she attempted to get on."

George T. Brady was the conductor of the Madison street trailer which was immediately behind the grip-car and the one appellee boarded. He had severed his connection with appellant several years before the trial. He testified in part as follows:

"At the time we came from the west on Madison street, and while the train was moving around the curve, I was on

the rear platform of my car. It was a closed car. The platform was open. As the car was about to make the curve I was on the right side of the platform. That would be the south side. The train at that time before stopping on State street did not make any stop west of State on Madison street in the vicinity of Buck & Rayner's or Streeter's store. The first stop we made after leaving Dearborn street was on State street facing north. I remember Miss Brown attempting to become a passenger on my car. The first I saw of this lady she was about eight or ten feet from the car running towards the front end of my trail car. She had a bundle or package under her arm or hand. We were going around the curve at this time very slow. This young lady stepped up on the front step of my trail-car, and as the cars swung around she seemed to lose her balance and straighten up. The conductor on the grip-car was on the front end of my trail-car. He reached over with one hand and caught hold of this young lady by the shoulder or arm and steadied her. She stepped up on the car platform and went inside and sat down. At the time she attempted to get on, the train was moving around the curve at about three miles an hour. Perrin was standing on the front platform of my train holding the iron gate that he had taken off a moment before. The curve commenced a little west of the cross-walk. When this lady attempted to get on the front platform of my trailer it was at the cross-walk right opposite the flagstone. My car was then upon the curve. This lady was not thrown from the car. No such thing happened. I went in and got the young lady's name."

The conductor of the second trailer was John A. Dare. He also had left appellant's employ some years before the trial. Part of his testimony is as follows:

" I was the conductor on the Ogden avenue trailer on the day it is claimed Miss Brown met with an accident in the vicinity of State and Madison streets. As our train came from the west on Madison street it did not make any stop on Madison street west of State. The first stop it made.

West Chicago St. R. R. Co. v. Brown.

there was on State street north of Madison. I know George T. Brady and a man by the name of Perrin and a man by the name of Stead. They and I were the only persons who comprised the crew of the whole train. The usual and customary place of stoppage of the West Chicago Street Railroad Company's Madison street trains for taking on and letting off passengers on December 11, 1896, in the vicinity of State and Madison streets, and for a year prior thereto, was on State street north of Madison. At the time and immediately before the accident to Miss Brown our train did not stop on Madison street at or near Streeter's west of State street, to take on and let off passengers. When I first saw Miss Brown she was just stepping off the sidewalk on Madison street. She was right on the cross-walk that runs from the Champlain building to Buck & Rayner's. At that time the grip-car was on the curve. I expect the train was going about three miles an hour at that time. The lady was coming with quick movement toward the car. That was all I could see. She was making a quick movement toward the car on the sidewalk. I did not see her hold up her right hand. She was walking quickly. The train was going. It was moving slowly, as usual. It did not stop at that time. It finally stopped on State street. I did not see anything else of this affair. The car was going around the curve, and when she came in contact with the car she was out of my sight. I was on the last car in the train."

Inasmuch as appellee's statement that the train stopped on Madison street west of State in response to her signal, and that she was thrown off by the sudden starting of the train which she was trying to get on, is contradicted by appellant's foregoing four witnesses, each of whom testified that the train did not stop west of State street, and that appellee boarded the train while in motion and slowly going around the curve, it is strenuously insisted that the verdict is against the evidence and should be set aside. And in this connection our attention is called to the testimony of a large number of witnesses who swore that the place where

appellee said the car stopped in response to her signal, was not the usual and customary place for cars to stop, but that they usually stopped on State street after turning the corner. The same witnesses, however, stated on cross-examination that trains would and did stop on Madison street if they were blocked by trains ahead or people crossing or by any other obstruction. As one witness, a conductor, puts it: "During the busy part of the day, it was a common thing for people to be passing there on State street so we had to stop before that crossing. People would sometimes get on and off the cars when we did stop there."

Two juries have believed appellee's version of the accident as against that of appellant's witnesses, and in our opinion it is not difficult to account for their findings. The question, of course, is not what the court would have found upon the same state of proof, but whether the verdict is so clearly against the evidence as the result of passion, prejudice or other improper influence upon the jury as to require the granting of a new trial. In the first place appellee's testimony is reasonable, probable and consistent and was not in any way weakened upon cross-examination. She was thrown upon her own resources at an early period of her life, and had in consequence for years been compelled to earn her own living. Her testimony as set forth in the record shows her to be an intelligent, educated, evenly poised and mentally well-balanced person. She rode on street cars almost daily and was quite familiar with the crossing at the corner of Madison and State streets. Such a woman may—as testified to by the gripman and the three conductors—have attempted to board a train while in motion and that too, while going around a curve, known to be an especially dangerous undertaking; but it is not probable that she would make such an attempt especially with a bundle in one of her hands, and when she knew that the train would stop on State street, some forty or fifty feet further on, and she denies having made the attempt. The gripman and each of the conductors testified that they had noticed appellee and followed her movements on the street

before boarding the car. Stead, the gripman, says: " I noticed this lady coming running to the car. She was on the corner of State and Madison. I was going round the curve and seen the lady coming. She run," etc. Perrin says: " I noticed this young woman before she left the sidewalk. I noticed she was hurrying for the car. When I first saw her, she had just about stepped off the sidewalk, about the middle of the sidewalk of State and Madison. \* \* \* She was walking for the trailer." Brady says: " The first I saw of this lady she was about eight or ten feet from the car running toward the front end of my trail-car." Dare says: " When I first saw Miss Brown she was just stepping off the sidewalk on Madison street. She was right on the cross-walk that runs from the Champlain building to Buck & Rayner's." That these four witnesses stationed at different places in the three cars of the train, (two of the cars being closed) had their four faces simultaneously turned in the direction of appellee and that each and all of them noticed her on the street and her movements to the car and at the same moment of time singled her out without knowing or being acquainted with her from among the multitude of other people walking to and fro at the most crowded crossing in the city, is a coincidence that the jury may perhaps have deemed a too severe strain on their credulity. None of these four witnesses, although they all testified to having seen appellee try to get into the car while in motion around the curve, made any attempt to warn her or stop the train. They all saw her endanger her person and possibly her life, and made no effort to prevent it. And this is true even of Perrin, the conductor of the grip-car, who as he says stood at the front platform of the first trailer, the place where she was endeavoring to mount. It appears that it was the duty of the conductors and gripmen of appellant to make a prompt report in writing to headquarters of all accidents to passengers. In his report of the accident in question, Stead said nothing about the car being in motion at the time appellee boarded the same. Brady, the conductor of the first trailer, testified

he was standing up straight on the rear platform of his car, which was a closed one; yet he says he saw both feet of appellee on the step of the front platform and that she did not stumble or fall, contradicting in that regard both Perrin and Stead. At the last trial Dare, the conductor of the second trailer, swore that he did not see appellee hold up her hands to signal the gripman. At the previous trial he had sworn that he did see her do it.

Complaint is made of the refusal of the court to receive in evidence section 1720 of the ordinances of Chicago and a rule of appellant providing that all cars will stop to receive and discharge passengers at the second crossing. The ordinance reads as follows:

"1720. Street cars shall stop to receive and to let off passengers at the intersections of streets, and in such manner as when stopped not to interfere with the travel on cross-streets, and in blocks more than five hundred feet in length they shall stop when so desired to receive and let off passengers at the middle of said block. Each team of horses hitched to a street car shall have a bell or bells attached to them. Rules regulating the running of cars and stopping for passengers must be posted in a conspicuous place in each car and must be in letters of such size as to be easily read from any part of such car."

No authorities are cited to show error in the court's ruling and we are aware of no principle of law which permits a party to make evidence for himself by introducing his own rule of conduct or those he prescribes for his employees.

The ordinance applies to cars at "intersections of streets," and not when turning a corner, as at State and Madison streets, and was therefore properly rejected.

The judgment appealed from is affirmed.

*Affirmed.*

MR. PRESIDING JUSTICE FREEMAN, dissenting.

Appellee states that she cannot tell how her foot was hurt, "only of course my feet were dragging. I don't know whether they struck the steps or the stones. They dragged me from the time I started on Madison street to

the time I reached the front of the Boston Store;" and she further says, "I presume my feet were both on the pavement when I alighted; I was not thrown clear down on the ground." She says the conductor helped her onto the car just as it was coming to a stop on State street. Appellee's story is therefore that as she was attempting to board a car which was at a standstill, and had placed her right foot on the first step the car was suddenly started with "a kind of short jerk," which threw her foot off the step onto the pavement. With both feet then on the pavement she clung to the car with her left hand and was dragged about seventy feet, which is the radius of the curve at that point, during which time she was swung out and back against the car three times, the last time catching hold of the car with her right hand also. Why she did not at once let go her hold on the car when it started up and her foot slipped back on the ground, she does not explain. It would seem from an ordinary view that there would have been no difficulty in letting go a car propelled by cable, just starting up to move around a curve, and she does not state that there was any. No sufficient reason is shown why appellee should have clung on for a distance of seventy feet, nor if she did so, holding with her left hand only and her feet were dragging, how her clothing and lower limbs could have escaped contact with the pavement, inflicting other injuries in addition to the sprained ankle of which she complains. Appellee's statement of the circumstances is uncorroborated. It stands upon her own unsupported statement and is directly contradicted by four witnesses for appellant. This testimony is positive and explicit. It is not impeached in any way so far as appears. Three of these witnesses were not in appellant's employ at the time of the trial. Unless we are to hold in effect that evidence given in behalf of a street railway company in a personal injury suit will be disregarded, I can discover no good reason for allowing appellee's unsupported statement to overbear the testimony of these witnesses. As we said in W. C. St. Ry. Co. v. Dean, 112 Ill. App. 10: "Upon the one side is the interest of ap-

pellee, which ought to subject her testimony to very close scrutiny when it is sought to sustain a judgment in her favor resting upon her unsupported evidence." In the case at bar it is difficult to reconcile appellee's version with the undisputed conditions. It is difficult to see how she could possibly have held on with one hand and have been dragged, as she says she was, around a curve of seventy feet, without showing other evidences of such experience than a mere sprain of one ankle. Her own testimony corroborates appellant's witnesses that they saw her leave the sidewalk. Upon the sole material fact whether the train was standing or in motion when she tried to board it she is overwhelmingly contradicted by witnesses whose credibility under the circumstances must be given at least equal weight with that of appellee. As said in Peaslee v. Glass, 61 Ill. 94–95: " There are very few cases in which a jury should find a verdict for the plaintiff upon his unsupported testimony alone when that testimony is positively contradicted by the defendant. It belongs to the plaintiff to make out a case." In this case at bar as was said in that quoted from, I am not prepared to sustain a verdict " resting only upon the evidence of the plaintiff, when that is contradicted not only by the defendant but also by another witness, and there are no elements of probability to turn the scale." This doctrine has been applied in a number of cases, and is in my judgment applicable here. It is not a question of mere numbers alone. It is the unsupported statement of an interested witness against the testimony of four unimpeached witnesses, three of whom are disinterested.